UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-31-11
```

-----------------------------------------------------------x

RICHARD AIELLO,                                    :
                                                   :
            Plaintiff,                        :
                                                   :          09 Civ. 7908 (PKC)
     -against-                            :
                                                   :          MEMORANDUM
KELLOGG, BROWN & ROOT SERVICES,                    :          AND ORDER
INC.,                                              :
                                                   :
            Defendant.                        :

-----------------------------------------------------------x

P. KEVIN CASTEL, U.S.D.J.:

          Plaintiff Richard Aiello alleges that he was injured when he fell to the ground in a

toilet facility within Camp Shield, a forward operating base in Iraq. Aiello, who at the time of

the injury was a civilian contractor, states that his injuries were caused by the negligence of

defendant Kellogg, Brown & Root Services, Inc. ("Kellogg"), a private service contractor.

Specifically, he claims Kellogg was responsible for the negligent construction, renovation, repair

and/or maintenance of the latrine facility. Kellogg provided support services at Camp Shield

pursuant to a Logistics Civil Augmentation Program ("LOGCAP") contract.

          The defendant has moved to dismiss plaintiff's claims or, alternatively, seeks

summary judgment dismissing these claims, on four separate grounds. First, that plaintiff's suit

is barred by the political question doctrine, because the military had plenary control over Camp

Shield and adjudication of the claim would require this Court to examine judgments and

decisions entrusted to the military in a time of war. Second, that plaintiff's suit is preempted by

federal policies that underlie the combatant activities exception to the Federal Tort Claims Act

(the "FTCA"), 28 U.S.C. § 2680(j). Third, that Kellogg is immune from suit under the principles

of "derivative sovereign immunity." Fourth, that the claim is barred under the Defense

Production Act of 1950 the ("DPA"), 50 U.S.C. §§ 2061–2172, because Kellogg's work was performed pursuant to a "rated order" contract under that statute, and section 707 of the DPA immunizes contractors from liability for damages for actions in the performance of a "rated order" contract.  This Court concludes that the political question doctrine does not render the claim non-justiciable.  It also concludes that tort claims against government contractors arising out of combatant activities are preempted by the unique federal interests that underlie the combatant activities exception to the FTCA.  It is not necessary to reach defendant's other arguments.  Accordingly, summary judgment for the defendant will be granted.


BACKGROUND

Camp Shield is a United States military base located approximately three miles outside the "Green Zone" in Baghdad, Iraq, near the district called Sadr City.  It is classified as a "forward operating base."  (Deposition of Major Frederick Allen Hockett, Jr. dated March 30, 2010 ("Hockett Dep.") at 7.)  In 2008, plaintiff was employed by DynCorp International, a private service contractor, as a police advisor and was assigned living quarters in building 9 at Camp Shield.  (Declaration of Richard Aiello dated June 16, 2010 ("Aiello Decl.") ¶¶ 2–3.)  Plaintiff alleges that on or about May 18, 2008, he fell while in a toilet facility in Building 9 on the camp premises, and was seriously injured.  (Complaint ¶ 10).  Plaintiff alleges that defendant Kellogg was negligent "in that the bathroom was improperly designed and constructed so that persons had to stand on loose tiles to use the bathroom; that defendant was further negligent in that its agents, servants and/or employees, washed the aforesaid tiles and failed to properly post a sign or warn persons of said wet and slippery condition, all of which constituted a danger, menace, hazard, nuisance and trap."  (Id. at ¶ 11.)

2

Kellogg is a private service contractor, retained by the United States military to perform operations and maintenance ("O&M") services at Camp Shield, as well as at other military bases in Iraq. (Declaration of Mike Mulholland dated December 11, 2009 ("Mulholland Decl.") ¶ 8.) These services are performed pursuant to a government contract, called the Logistics Civil Augmentation Program ("LOGCAP") Contract No. DAAA09-02-D-0007 (the "LOGCAP Contract"). (Id. ¶ 3.) That contract is administered through various "Task Orders" issued by the United States Army, and Task Order 139 directs Kellogg to provide O&M services to various bases in Iraq, including Camp Shield. (Id. ¶¶ 7-8.)

Camp Shield acts as "a refit, re-arming point, and a living area" for U.S. and coalition military forces. (Hockett Dep. at 7.) Activities at Camp Shield include supporting the transition of the Iraqi government, training Iraqi police officers, and providing internal security in Iraq. (Id. at 8-9.) During the relevant time period, the base operated under a "uniform posture" threat level ranging from (1) to (4). At threat level (1), military and contractor personnel were required to have personal protective equipment, such as Kevlar vests and helmets, reachable within 10 minutes. At the highest level (4), body armor and helmets had to be worn indoors and outdoors at all times. (Id. at 25–28.) During 2008, the uniform posture was raised to level (3) on several occasions, requiring military and contractor personnel to wear their body armor and helmets outdoors at all times. (Id. at 90.) Whenever personnel left the base, they were at uniform posture (4). (Id. at 27.) Around Easter 2008, Camp Shield was subject to three incidents of mortar and rocket attacks. (Id. at 16–17.) In one of those attacks, a round landed inside the Camp and damaged several trucks and housing units. (Id. at 17–18.) The base was protected by military personnel and armed civilian security contractors, who set up observation towers in a perimeter around the base. Entry to the base was secured, as the base

was accessed through guarded entry control points.  (Id. at 28–29.)  The base housed

approximately two thousand personnel, of which five hundred were soldiers and one thousand

five hundred were contractors.  (Id. at 13–14.)  The majority of those contractors, over nine

hundred, were armed security contractors largely responsible for the defense of the base.  (Id. at

13–14, 28.)  Additionally, daily patrols of military police or security contractors operated out of

the base, and these teams were often involved in combat.  (Id. at 93–94, 104–105.)

       A group of military personnel called the "Mayor's Cell" controlled base

operations, including life support functions at the Camp such as living, housing and dining

facilities.  (Id. at 35, 37.)  From March 2008 to January 2009, Major Frederick Allen Hockett, Jr.,

was the "Mayor," the head of the Mayor's Cell.  (Id. at 7.)  While deployed at Camp Shield

during the relevant time period, Major Hockett received combat pay.  (Id. at 25.)  The Mayor's

Cell monitored the work and performance of service contractors such as Kellogg.  (Id. at 59.)  To

perform major renovation projects, Kellogg would generate of list of needed projects which the

Mayor's Cell would prioritize based upon budgetary and other considerations.  (Declaration of

Tommy Pauley dated April 17, 2010 ("Pauley Decl.") ¶ 7.)  After a major renovation, the

Mayor's Cell would complete a quality completion report.  (Hockett Dep. at 63.)

       The building in which plaintiff was allegedly injured, Building 9, was a

"hardstand" building, meaning it existed before the arrival of the military.  (Id. at 41, 67–68.)

The record is not clear as to whether Kellogg performed any major renovation work in Building

9, but it is undisputed that Kellogg was responsible for O&M at that building.

DISCUSSION

      I.     Legal Standard

Kellogg moves to dismiss the complaint under Rules 12(b)(1) and 12(b)(6), Fed.

R. Civ. P., or, in the alternative, a grant of summary judgment dismissing Aiello's claims

pursuant to Rule 56, Fed. R. Civ. P.

The political question doctrine is more properly characterized as a "justiciability"

question than as a question of subject matter jurisdiction. See Baker v. Carr, 369 U.S. 186, 198

(1962). Nevertheless, it is properly raised on a motion under Rule 12(b)(1). See Republic of

Colombia v. Diageo North America Inc., 531 F.Supp.2d 365, 381 (E.D.N.Y. 2007) (defenses

going to justiciability or abstention are properly raised by 12(b)(1) motion) (citing United States

v. Portrait of Wally, 99 Civ. 9940, 2002 WL 553532 at * 6 (S.D.N.Y. Apr. 12, 2002)).

A motion to dismiss under Rule 12(b)(1) is decided under the same standards as a

motion to dismiss for failure to state a claim under Rule 12(b)(6). Lerner v. Fleet Bank, N.A.,

318 F.3d 113, 128 (2d Cir. 2003) ("[T]he standards for dismissal under 12(b)(6) and 12(b)(1) are

substantively identical."). However, "[i]n resolving a motion to dismiss for lack of subject

matter jurisdiction under Rule 12(b)(1) a district court may consider evidence outside the

pleadings." Morrison v. National Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008).

Kellogg raises three other defenses: preemption, derivative sovereign immunity,

and a provision of the Defense Production Act. These defenses are raised by a motion to dismiss

the complaint under Rule 12(b)(6), Fed. R. Civ. P. or, in the alternative, for summary judgment

pursuant to Rule 56. Because Kellogg's motion includes matters outside the pleadings, and

Aiello has responded to Kellogg's motion with declarations and documents that expand upon the

allegations in the complaint, the Court concludes that Kellogg's motion is properly resolved

under Rule 56.  <u>See</u> Rule 12(d).  In reaching this conclusion, the Court notes that Aiello does not

contest the procedural form of Kellogg's motion and has not stated any need for further

discovery to support his opposition in his submissions to the Court.  This is not a case where a

Rule 12(b)(6) motion is converted into a Rule 56 motion and a further opportunity to respond

may be required under Rule 12(d).  Here, the motion itself placed Aiello on notice that Rule 56

had been invoked.  <u>See</u> <u>Aetna Cas. & Sur. Co. v. Aniero Concrete Co.</u>, 404 F.3d 566, 573 (2d

Cir. 2005) (summary judgment appropriate where both parties relied on documentary evidence

outside the pleadings, and motion states that it seeks summary judgment in the alternative).

Furthermore, this Court allowed the parties to conduct discovery to support or oppose the

motion. Since March 19, 2010, Aiello has had "[a]ll facts, documents or affidavits on which

defendant proposes to rely in making its anticipated motion pursuant to Rules 12(b)(1) and

12(b)(6), Fed. R. Civ. P." (Document No. 16.)  Furthermore, the plaintiff was allowed to "seek

leave to conduct discovery in connection therewith" by March 30, 2010 (<u>id.</u>), and the former

base commander was deposed.  Therefore, this motion is appropriately decided as a motion for

summary judgment under Rule 56.

   Summary judgment "shall" be granted "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Rule 56(a), Fed. R. Civ. P.  It is the initial burden of a movant on a summary judgment

motion to come forward with evidence on each material element of his claim or defense,

demonstrating that he or she is entitled to relief.  A fact is material if it "might affect the outcome

of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

(1986).  The evidence on each material element must be sufficient to entitle the movant to relief

in its favor as a matter of law. <u>Vt. Teddy Bear Co. v. 1-800 Beargram Co.</u>, 373 F.3d 241, 244

(2d Cir. 2004). In raising a triable issue of fact, the non-movant carries only "a limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004) (quoting Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotations and citations omitted); accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). In reviewing a motion for summary judgment, the court may scrutinize the record, and grant or deny summary judgment as the record warrants. Rule 56(c). In the absence of any disputed material fact, summary judgment is appropriate. Rule 56(a).

Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996) (citing Matsushita, 475 U.S. at 587); see also Anderson, 477 U.S. at 249–50 (summary judgment may be granted if the evidence is "merely colorable" or "not significantly probative") (citations omitted). An opposing party's facts "must be material and of a substantial nature, not fanciful frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions." Contemporary Mission, Inc. v. U.S. Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981) (quotation marks omitted).

7

II.     Political Question Doctrine

Kellogg argues that this Court lacks subject matter jurisdiction, because the complaint is nonjusticiable under the political question doctrine.[1]  This doctrine is "primarily a function of the separation of powers."  Baker v. Carr, 369 U.S. 186, 210 (1962).  "Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."  Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803).  The Supreme Court

> has set forth six independent tests has set forth six independent
> tests for the existence of a political question: "[1] a textually
> demonstrable constitutional commitment of the issue to a
> coordinate political department; or [2] a lack of judicially
> discoverable and manageable standards for resolving it; or [3] the
> impossibility of deciding without an initial policy determination of
> a kind clearly for nonjudicial discretion; or [4] the impossibility of
> a court's undertaking independent resolution without expressing
> lack of the respect due coordinate branches of government; or [5]
> an unusual need for unquestioning adherence to a political decision
> already made; or [6] the potentiality of embarrassment from
> multifarious pronouncements by various departments on one
> question." These tests are probably listed in descending order of
> both importance and certainty.

Vieth v. Jubelirer, 541 U.S. 267, 278 (2004) (quoting Baker, 369 U.S. at 217).

As the Second Circuit has recognized, "Baker set a high bar for nonjusticiability." Connecticut v. American Elec. Power Co., 82 F.3d 309, 321–322 (2d Cir. 2009).  "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence."  Baker, 369 U.S. at 217 (emphasis added).  Furthermore, "[n]otwithstanding ample litigation, the Supreme Court has only rarely

---

[1] The political question doctrine is a "threshold" issue, and I will therefore address it before turning to any merits defenses.  See Can v. United States, 14 F.3d 160, 162 n.1 (2d Cir. 1994) ("[J]usticiability is also a 'threshold' question.").

found that a political question bars its adjudication of an issue." American Elec., 82 F.3d at 321 (citation omitted).

Several courts have dismissed suits against military contractors on political question grounds. See, e.g., Carmichael v. Kellogg, Brown & Root Services, Inc., 572 F.3d 1271 (11th Cir. 2009) (dismissing negligence claims for operation of a convoy vehicle, where the military controlled all aspects of the convoy operation, and claims for negligent military training); Taylor v. Kellogg Brown & Root Services, Inc., No. 09 Civ. 341, 2010 WL 1707530 (E.D. Va. April 16, 2010) (dismissing negligence claims arising from maintenance of a generator in a tank yard on a forward operating base in Iraq, where defendant claimed military command decisions were responsible for the accident); Smith v. Halliburton Co., 2006 WL 2521326 (S.D. Tex. Aug. 30, 2006) (dismissing negligence claims arising from a suicide bombing at a dining hall, because the military controlled base security); Whitaker v. Kellogg, Brown & Root, Inc., 444 F. Supp. 2d 1277 (M.D. Ga. 2006) (same); Bentzlin v. Hughes Aircraft Co., 833 F. Supp. 1484 (C.D. Cal. 1993) (dismissing claim alleging design defects in missile system, where soldiers were killed by friendly fire).

However, many other courts have declined to dismiss such suits. See, e.g., Lane v. Halliburton 529 F.3d 548, 563 (5th Cir. 2008) (political question did not bar claims where the court "will not inevitably be drawn into a reconsideration of military decisions or be forced to announce its opposition to an Executive or Congressional policy"); McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1365 (11th Cir. 2007) ("It would be inappropriate to dismiss the case on the mere chance that a political question may eventually present itself," where it was not clear that military judgment would be questioned); Bixby v. KBR, Inc., ___ F. Supp. 2d ___, 2010 WL 4296637 (D. Or. Oct. 22, 2010) (refusing dismissal where negligence suit focused on

"defendants' performance of its contractual obligations to the government . . . rather than the advisability of any governmental policy-related decision"); Harris v. Kellogg, Brown & Root Services, Inc., 618 F. Supp. 2d 400 (W.D. Pa. 2009) (refusing dismissal of negligence claim of faulty shower wiring, where the claims did not implicate any policies or decisions of the military); Lessin v. Kellogg Brown & Root, No. 05 Civ. 1853, 2006 WL 3940556 (S.D. Tex. June 12, 2006) (negligence claim by soldier arising from contractor's failure to maintain a vehicle not barred, where it did not implicate policies or decisions of the military).

Kellogg does not specifically identify which Baker factors are implicated by the plaintiff's claims. However, an analysis of the cases cited above discloses that, in suits against military contractors, under any cited Baker factor the common inquiry is whether a court resolving the plaintiff's claims would be required to second-guess military strategic, tactical, or policy decisions. This seems to focus the inquiry on the first Baker factor, whether there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." Baker, 369 U.S. at 217. "[T]he Constitution commits to Congress the power to raise and support an army and navy, and to the Executive the responsibilities of commanding those armed forces." Lane, 529 F.3d at 559. However, where a suit is against a military contractor, the defendant must "demonstrate that the claims against it will require reexamination of a decision by the military." Id. at 560 (emphasis in original). When faced with an "'ordinary tort suit,' the textual commitment factor actually weighs in favor of resolution by the judiciary." Id. (citing Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49–50 (2d Cir. 1991)). Furthermore, a court may find that "the political question doctrine [is] not implicated despite some military presence and decision-making." Harris, 618 F. Supp. 2d at 424.

Kellogg argues that in analyzing this question, this Court "must 'look beyond the complaint, considering . . . how Defendant would defend'" the claims. (Br. at 17 (quoting Taylor, 2010 WL 1707530 at *4 and Lane, 529 F.3d at 565.)) Kellogg further states that it "will argue that Plaintiff would not have been injured but for the military's decisions to house Plaintiff in a pre-existing Iraqi hardstand building, and to only permit [Kellogg] to renovate certain buildings." (Reply at 5.) However, Kellogg's argument is flawed, because it ignores the allegation in the complaint that it was "negligent in that its agents, servants and/or employees, washed the [bathroom] tiles and failed to properly post a sign or warn persons" of the hazard, which caused the fall. Kellogg instead focuses only on the allegation that it was negligent in designing, renovating, or failing to renovate the facility, which decision it claims was made by the military. However, the allegation regarding negligence in washing the floor could stand alone and support a claim without implicating any military decisions. Even as to the plaintiff's claims of negligent design or renovation, those claims could rely on analyzing "KBR's performance once it undertook certain work and under its contract with the Army," rather than the decision to undertake the work itself. Harris, 618 F. Supp. 2d 400.

Under the facts of the complaint, this Court will not "inevitably be drawn into a reconsideration of military decisions." Lane, 529 F.3d at 563 (emphasis added). It is therefore inappropriate to dismiss under this doctrine, where there is a "mere chance" that a political question will present itself. See McMahon, 502 F.3d at 1365.

As for the second Baker factor, the existence of judicially discoverable and manageable standards, I note that neither party has addressed the seemingly difficult choice of law question that could arise as to which jurisdiction's negligence law would govern – e.g., Iraq, where the incident occurred, New York, the state where plaintiff resides, Texas, the state where

Kellogg is headquartered, federal common law or some combination of the foregoing. However, courts are equipped to deal with choice of law questions, and the core allegations in this suit are dealt with by courts on a daily basis. Indeed, "[d]amage actions are particularly judicially manageable." Koohi v. U.S., 976 F.2d 1328, 1332 (9th Cir. 1992).

In this type of case, the inquiry on the third and fourth Baker factors—the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; and the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government—is essentially the same as that on the first. If military tactical, strategic, or policy judgment is not necessarily questioned or re-examined, then no policy determination is necessary and there will be no lack of respect for coordinate branches.

Finally, the fifth and sixth Baker factors do not appear to apply in this case. Therefore, the political question doctrine does not foreclose consideration of the claim. It is justiciable.

### III.     FTCA Combatant Activities Exception

Kellogg argues that the plaintiff's claim is preempted by federal law because imposing tort liability would create a significant conflict with a unique federal interest. In order to demonstrate that such a conflict exists, the defendant relies upon the "combatant activities" exception to the FTCA. 28 U.S.C. § 2680(j). The FTCA generally waives the United States' sovereign immunity in tort suits against the government for the wrongful acts of any employee of the United States. See 28 U.S.C. §§ 1346(b), 2671–80. That waiver is subject to exceptions, which preserve the government's sovereign immunity under certain circumstances. One of those

12

exceptions preserves sovereign immunity for any "claim arising out of the combatant activities of the military or naval forces . . . during time of war." Id. at § 2680(j). However, the defendant does not fall within the statutory exception, which applies to the sovereign; government contractors are expressly excluded from the scope of the FTCA. Id. at § 2671.

a.   Boyle v. United Technologies Corp.

Defendant argues that the combatant activity exception in the FTCA outlines a unique federal interest, and that the adjudication of plaintiff's claim would pose a significant conflict with that interest. The Supreme Court has identified unique federal interests by reference to a different exception to the FTCA, and concluded that a suit against a private contractor would present a significant conflict with that interest. See Boyle v. United Technologies Corp., 487 U.S. 500 (1988). In Boyle, the plaintiff brought suit against a private contractor based upon an alleged design defect in a helicopter built by the defendant. The helicopter crashed into the ocean in a training accident, and the copilot, United States Marine David A. Boyle, was unable to escape the helicopter and drowned. His father sued the contractor, claiming that the design of an escape hatch was defective, and this defect caused his son's death. The Supreme Court held that the suit was preempted, finding a "significant conflict" between federal interests and the state law under which the plaintiff was suing. In finding this conflict, the Court examined the "discretionary function" exception to the FTCA. Id. at 511 (citing 28 U.S.C. § 2680(a)). The discretionary function exception preserves federal sovereign immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.

2680(a).  The Court found the creation of design specifications for military equipment was "assuredly a discretionary function within the meaning" of the FTCA when the specifications are created by the Government, and that permitting second-guessing of those discretionary judgments "through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption.  The financial burden of judgments against the contractors would ultimately be passed through . . . to the United States itself."  Boyle, 487 U.S. at 511-12.  Therefore, "[i]t makes little sense to insulate the Government against financial liability for the judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production."  Id. at 512.

The Court adopted a test to determine where preemption applies to insulate a government contractor from liability, stating that:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

Id.  The first two prongs of this test "assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated—i.e., they assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself."  Id.  The third condition seeks to remove any incentive for contractors to withhold knowledge of risks from the Government.  Id.

          b.      The Considerations that Underlie Boyle Apply to the "Combatant Activities" Exception

Kellogg seeks to extend the reasoning of Boyle to the "combatant activities" exception of the FTCA, arguing that allowing a tort suit for an injury arising in an indoor latrine

on a forward operating base in Iraq would significantly conflict with the unique federal interest in "the elimination of tort from the battlefield." (Brief at 14 (quoting Saleh v. Titan, 580 F.3d 1, 7 (D.C. Cir. 2009))). Kellogg specifically disclaims reliance, however, on the "government contractor" defense laid out by Boyle, which turns on the discretionary function exception to the FTCA.[2]

Whether combatant activities preemption extends to contractors has been addressed by several courts. The United States Court of Appeals for the District of Columbia Circuit found that the reasoning of Boyle extended to the combatant activities exception. Saleh v. Titan, 580 F.3d 1 (D.C. Cir. 2009). The Saleh Court found that there are uniquely federal interests implicated in combat activities, and that state tort law can significantly conflict with those federal interests. Id. at 6–9.

In Saleh, Iraqi nationals or their widows brought actions against American military contractors that had provided interrogators or interpreters to the U.S. military, alleging that the plaintiffs or their relatives had been abused by employees of the contractors during their detention and interrogation by the U.S. military at the Abu Ghraib prison complex. Id. at 2. The Court held that their claims were preempted, reasoning that, just as the discretionary function exception outlines an area of conflict between state law and federal interests, so does the combatant activities exception. The Saleh court found that this area of conflict is even broader than in Boyle, a "more general conflict preemption, to coin a term, 'battle-field preemption': the federal government occupies the field when it comes to warfare, and its interest in combat is always 'precisely contrary' to the imposition of a non-federal tort duty." Id. at 7 (quoting Boyle,

---

[2] Presumably, this is because there is no evidence that the United States approved reasonably precise specifications and that the equipment conformed to those specifications. In other words, there is no proffered evidence that the challenged discretion exercised here, designing the urinals and maintaining the toilet facility, was exercised by the government.

487 U.S. at 500). This conclusion was based in part on <u>Boyle</u>'s reasoning that "the costs of imposing tort liability [are] passed through to the American taxpayer," but also because allowing such tort suits would "require extensive judicial probing of the government's wartime policies," including by haling military personnel into "lengthy and distracting court or deposition proceedings," and further could "hamper military flexibility and cost-effectiveness, as contractors may prove reluctant to expose their employees to litigation-prone combat situations." <u>Id.</u> at 8.

Some courts have declined to adopt the rationale of <u>Boyle</u> to the combatant activities exception to preempt negligence claims against military contractors. <u>See Al-Quraishi v. Nakhla</u>, 728 F. Supp. 2d 702 (D. Md. 2010); <u>McMahon v. Presidential Airways, Inc.</u>, 460 F. Supp. 2d 1315 (M.D. Fla. 2006); <u>Carmichael v. Kellogg, Brown & Root Services, Inc.</u>, 450 F. Supp. 2d 1373 (N.D. Ga. 2006); <u>Fisher v. Halliburton</u>, 390 F. Supp. 2d 610 (S.D. Tex. 2005).

It may be that the express exclusion of private contractors from the FTCA reflects a decision by lawmakers to allow suits against private contractors even for areas where the United States would be excepted under the FTCA.[3] 28 U.S.C. § 2671; <u>see Al-Quraishi</u>, 728 F. Supp. 2d at 739–40. However, such an interpretation would conflict with <u>Boyle</u>. <u>See Saleh</u>, 580 F.3d at 6 ("Our dissenting colleague contends repeatedly that the FTCA is irrelevant because it specifically excludes government contractors. . . . [H]e is quarreling with <u>Boyle</u> where it was similarly argued that the FTCA could not be a basis for preemption of a suit against contractors." (citations omitted)). Under <u>Boyle</u>, there is preemption of non-federal substantive law where (1) there is a unique federal interest at stake, and (2) the non-federal substantive law would present a "significant conflict" with that interest. 487 U.S. at 507. This type of preemption is distinct

---

[3] "[T]he legislative history of the combatant activities exception is 'singularly barren.'" <u>Boyle</u>, 580 F.3d at 7.

from ordinary preemption when Congress legislates "in a field which the States have traditionally occupied." Id. at 507 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947). The existence of a unique federal interest "changes what would otherwise be a conflict that cannot produce pre-emption into one that can." Boyle, 487 U.S. at 507–08.

### c.   The Unique Federal Interest

Aiello does not contend that the United States lacks a "unique federal interest" in claims "arising out of the combatant activities of the military or naval forces . . . during time of war." 28 U.S.C. § 2680(j). One court has noted that "[t]here is no question that the activities of private contractors, acting under the supervision of the military in a war zone, fall within an area of 'uniquely federal interest.'" Taylor v. Kellogg Brown & Root Services, Inc., No. 09 Civ. 341, 2010 WL 1707530 (E.D. Va. April 16, 2010) (quoting Boyle, 487 U.S. at 505 n.1). However, the contours of that unique interest must be determined in order to determine whether imposition of state tort law could cause a "significant conflict."

Courts considering the question have used various formulations to describe the federal interest at stake. The Saleh Court stated that "the policy embodied by the combatant activities exception is simply the elimination of tort from the battlefield, both to preempt state or foreign regulation of federal wartime conduct and to free military commanders from the doubts and uncertainty inherent in potential subjection to civil suit." Saleh, 580 F.3d at 7. That court also cited Koohi v. United States, 976 F.2d 1328, 1337 (9th Cir. 1992), which found that the combatant activities exception was designed "to recognize that during wartime encounters, no duty of reasonable care is owed to those against whom force is directed as a result of authorized military action." In the factual context currently facing this Court, the differences between these

formulations are significant.  If the federal interests are to entirely eliminate tort from the

battlefield and to preempt other regulation of federal wartime conduct, then negligence law

regulating toilet design and maintenance could potentially conflict with these interests.

However, if Koohi's formulation is correct, there would be no conflict here because the duty of

reasonable care is not being imposed as to "those against whom force is directed."

          To remove the duty of care only as to "those against whom force is directed" is

unduly narrow.  The combatant activities exception preserves immunity as to any "claim arising

out of the combatant activities of the military."  28 U.S.C § 2680(j) (emphasis added).  This

familiar "arising out of" language, as recognized in Saleh, has long been used in workmen's

compensation statutes "to denote any causal relationship between the term of employment and

the injury."  Saleh, 580 F.3d at 6 (citing O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 54,

507 (1951)).  The Second Circuit has held such language to be expansive in other federal

statutes, as well.  See Benzman v. Whitman, 523 F.3d 119, 125-26 (2d Cir. 2008) (suggesting

that statute providing cause of action for claims "arising out of" the September 11 attacks may

cover claims that government officials misrepresented air-quality risks following the attacks); In

re WTC Disaster Site, 414 F.3d 352, 377 (2d Cir. 2005) ("As it requires no great stretch to view

claims of injuries from inhalation of air rendered toxic by the fires, smoke, and pulverized debris

caused by the terrorist-related aircraft crashes of September 11 as claims 'relating to' and

'arising out of' those crashes, we conclude that Congress intended ATSSSA's cause of action to

be sufficiently expansive to cover claims of respiratory injuries by workers in sifting, removing,

transporting, or disposing of that debris.").

          To narrow the scope of the combatant activities exception to claims by "those

against whom force is directed" could potentially mean that a duty of care would still exist as to

18

bystanders and allies, even in actual live-fire combat events. Force not "directed" at them could still cause them harm. The combatant activities exception "reflects the need to avoid second-guessing military 'judgment as to the balancing of many technical, military, and even social considerations.'" Taylor, 2010 WL 1707503, at *9 (quoting Boyle, 487 U.S. at 511). It also reflects the federal interest in freeing "military commanders from the doubts and uncertainty inherent in potential subjection to civil suit," and recognizes that "the costs of imposing tort liability on government contractors is passed through to the American taxpayer." Saleh, 580 F.3d at 7, 8. These purposes would not be served by the narrow Koohi formulation, which limits the interest to precluding suits brought by those against whom force is directed.

This Court respectfully disagrees with the Koohi Court's formulation of the United States' interest in claims against military contractors arising out of combatant operations, and adopts the Saleh Court's formulation.

### d.  Significant Conflict

The Boyle Court stated that the discretionary function exception within the FTCA "demonstrates the potential for, and suggests the outlines of, 'significant conflict' between federal interests and state law in the context of Government procurement." Boyle, 487 U.S. 500, 511. Similarly, the combatant activities exception demonstrates the potential for, and suggests the outlines of, significant conflict between federal interests and state law in the context of military activity.

The nature of the unique federal interest here, namely "the elimination of tort from the battlefield" and to "preempt state or foreign regulation of federal wartime conduct," suggests that any non-federal substantive negligence law will cause "significant conflict" with

that interest.  Here, this Court concludes that the combatant activities preemption is a type of field preemption.  This is a rational extension of Boyle, which itself suggested that such areas of field preemption would exist.  The Boyle Court stated that "[i]n some cases, for example where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts and is replaced by federal rules."  487 U.S. at 508 (citing Clearfield Trust Co. v. United States, 318 U.S. 363 (1943)).  The combatant activity of the military is such an area.  The court in Saleh agreed:

> We note that this [combatant activity] exception is even broader than the discretionary function exception.  In the latter situation, to find a conflict, one must discover a discrete discretionary governmental decision, which precludes suits based on that decision, but the former is more like a field preemption, see, e.g., [Clearfield, 318 U.S. at 366–67], because it casts an immunity net over any claim that arises out of combat activities.

Saleh, 580 F.3d at 6 (emphasis in original).

One of Boyle's major underpinnings is the idea that "[t]he financial burdens of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United states itself, since defense contractors will predictably raise their prices to cover, or insure against, contingent liability."  Boyle, 487 U.S. at 512.

Furthermore, if claims against a contractor arising out of combatant activities were not preempted, then there would be a legitimate need for the contractor's lawyers, engineers and/or investigators to inspect the condition of the scene of the allegedly tortuous act and interview witnesses, including military personnel.  Inherently, these activities would pose a significant risk of interfering with the military's combat mission.  The alternative, relegating the contractor to defending the claim without the benefit of such an investigation, could result in a deprivation of the contractor's property without the important right to discover favorable evidence; this, in turn, would lead to higher costs of contracting for the United States.

20

Preemption of all claims against private contractors arising out of combatant activities eliminates the significant conflict with this unique federal interest.

The Court concludes that the combatant activity exception creates a type of field preemption, broader than the political question doctrine considered above.  It is not necessary to determine whether military judgments would necessarily be examined in hearing the suit, because any claim arising out of combatant activities is preempted.

### e.  Combatant Activity

Having determined that the unique interest of the United States preempts non-federal law for claims arising out of combatant activities, this Court must now determine whether the claim here actually arises from combatant activities.  In <u>Saleh</u>, there was no real dispute that the complained-of acts, detention and interrogation of enemy combatants, were "combatant activities."  580 F.3d at 6.  This action presents a much closer question: is the design, operation and maintenance of toilet facilities located on a forward operating base "combatant activity"?

In attempting to define combatant activity, many of the recent cases construing the exception cite to a case from the Ninth Circuit Court of Appeals, <u>Johnson v. United States</u>, 170 F.2d 767 (1948).  In <u>Johnson</u>, a civilian plaintiff brought suit against the United States based upon claimed pollution of the plaintiff's "clam farm" by vessels of the United States Navy.  The naval vessels were ammunition cargo ships which had previously been engaged in "active logistical support of combat operations" in the Pacific theatre of World War II, but upon the termination of hostilities were sent to Discovery Bay in the State of Washington.  There, the vessels allegedly discharged oils, sewage, and other noxious matter which polluted the waters and tide lands owned by the plaintiff, damaging his commercial clam farm.  The United States

21

moved to dismiss the action based upon the combatant activities exception to the FTCA, and the district court granted the motion.  The Ninth Circuit reversed, finding that "the act of dumping noxious matter into the waters of a peaceful American harbor under the conditions here shown to exist [cannot] be held to have arisen out of combatant activities of these war vessels."  Id. at 770.

Examining the exception, the court held that "'combatant activities' . . . would [ ] include not only physical violence, but activities both necessary to and in direct connection with actual hostilities."  Id.  Expanding on this test, the court explained:

> The rational test would seem to lie in the degree of connectivity. Aiding others to swing the sword of battle is certainly a 'combatant activity,' but the act of returning it to a place of safekeeping after all of the fighting is over cannot logically be cataloged as a 'combatant activity.'

Id.  The court noted, however, that "[t]he act of supplying ammunition to fighting vessels in a combat area during war is undoubtedly a 'combatant activity,'" therefore suggesting that "active logistical support of combat operations," which the ships were previously engaged in, would have fallen within the exception.  Id. at 768, 770.

The Johnson test, "necessary to and in direct connection with actual hostilities," has been adopted by many of the courts considering the combatant activities exception.  Koohi, 976 F.2d 1328, 1333 n.5 ("The tracking and attempted identification of an unidentified and apparently threatening aircraft is a necessary adjunct of the power of self-defense [and therefore], under Johnson, [qualifies] as 'combatant activities.'"); Bixby v. KBR, Inc., ___ F. Supp. 2d ___, 2010 WL 4296637, at *17 (D. Or. 2010) (defendants' operations to restore Iraqi oil production were not combatant activity); Taylor, 2010 WL 1707530, at *10 (repairing electric generator for tank maintenance depot at a base in Iraq is combatant activity).  A recent case in this district adopts the Johnson test.  Matthew v. United States, 452 F. Supp. 2d. 433, 444 (S.D.N.Y. 2006) (allegedly negligent medical treatment after discharge from service not

22

necessary to actual hostilities).

Some courts have rejected the Johnson test in favor of a more narrow exception. See Al Shimari v. CACI Premier Technology, Inc., 657 F. Supp. 2d 700, 721 (defining combatant activities as "the actual engaging in the exercise of physical force") (quoting Skeels v. United States, 72 F. Supp. 372, 374 (W.D. La. 1947)).  This Court declines to adopt this more narrow test, and will adopt the Johnson test.  Combat consists of more than the actual exercise of physical force.  That definition would exclude ammunition supply, the movement of troops during or in preparation for combat, and holding prisoners of war.  Rather, the "rational test would seem to lie in the degree of connectivity," and that activities other than the actual use of physical force can be combatant activity.  Johnson, 170 F.2d at 770.

The case factually closest to this one is Harris v. Kellogg Brown & Root Services, Inc., 618 F. Supp. 2d 400 (W.D. Pa. 2009).  There, the family of an American serviceman sued Kellogg for negligence in providing operations and maintenance services after a water pump short-circuited, causing a serviceman to be electrocuted while showering at a military base in Baghdad, Iraq.  618 F. Supp. 2d at 403.  The Harris Court held that the action based upon the contractor's alleged negligence in maintaining the water pump did not involve "claims arising from active military combat operations."  Id. at 434.  Instead, the court describes the contractor as merely "providing maintenance services to the United States Army."  Id.

This Court respectfully disagrees with the reasoning of the Harris Court.  Under the Johnson test, "active logistical support of combat operations" may constitute combatant activity.  Johnson, 170 F.2d at 768, 770.  In this action, Kellogg was providing basic life support services for active military combatants on a forward operating base.  The United States military chose to set up a forward operating base in Iraq, and to equip it with a place for soldiers to

perform necessary functions. If a small team of American soldiers operating in hostile territory had set up a camp and dug an open pit latrine, an injured civilian contractor's claim against the United States would fall comfortably within the combatant activities exemption to the FTCA. The fact that Camp Shield utilized hardstand buildings, and the military chose to use civilian contractors to equip and maintain the indoor latrine, does not transform the complained-of conduct into non-combatant activity. The creation and maintenance of toilets at Camp Shield was active logistical support of combat operations, both necessary to and in direct connection with actual combat.

An important consideration in this determination is the nature of Camp Shield and its connection to actual hostilities. In uncontroverted deposition testimony, United States Army Major Frederick A. Hockett, Jr. established that Camp Shield exists in a combat environment. Camp Shield was three miles outside of the Baghdad Green Zone, operating as a "secured area where U.S. forces are able – and coalition forces are able to operate . . . . They use it as a refit, re-arming point, and a living area." (Hockett Dep. at 7.) During the relevant time period, the camp operated under a "uniform posture" threat level ranging from (1) to (4). At threat level (1), military and contractor personnel were required to have personal protective equipment, such as Kevlar vests and helmets, reachable within 10 minutes. At the highest level (4), body armor and helmets had to be worn indoors and outdoors at all times. As noted, during the relevant time period, the uniform posture was raised to level (3) several times, requiring military and contractor personnel to wear their body armor and helmets outdoors at all time. While deployed at Camp Shield during the relevant time period, Major Hockett received combat pay.

Camp Shield was subject to three incidents of mortar and rocket attacks near the time of the plaintiff's injury. In one of those attacks, a round landed inside the Camp and

damaged several trucks and housing units.  As the Taylor court noted, "[i]f shelling and

receiving shelling is not combat, then combat has no meaning."  Taylor, 2010 WL 1707530 at

*10.  Additionally, daily patrols of military police or security contractors operated out of the

base, and these teams were often involved in combat.  (Hockett Dep. at 93–94, 104–105.)  That

private contractors performed this role makes their actions no less "combatant activities" than

any of numerous historical examples of the use of mercenary forces in combat.  See, e.g., Ronald

Atwood, The Hessians: Mercenaries from Hessen-Kassel in the American Revolution (1980).  In

Iraq, the nature of the warfare dictates that policing patrols be an integral part of offensive and

defensive combat operations.  See U.S. Dep't of the Army, Field Manual: Counterinsurgency

(FM-3-24) (2006).

　　　　　Unlike the camp in Taylor, artillery was not fired from Camp Shield.  That makes

it a somewhat closer question, but the design, operation and maintenance of basic life-support

facilities at a forward operating base, which served as a refit and re-arming point for soldiers

involved in combat and which came under hostile fire, is necessary to and in direct connection

with actual hostilities.  It is therefore combatant activity.

　　　　　At first glance, indoor latrine maintenance may not appear related to combatant

activity.  But, since at least the Roman campaign against Carthage there has been an

acknowledged relationship between the upkeep of latrines and the health of fighting forces.  See

Nathan Rosenstein, Rome at War: Farms, Families and Death in the Middle Republic (2004), at

132-33 (describing typhoid outbreaks during the Hannibalic War arising at extended

encampments where there was no evidence of latrines equipped with running water, as opposed

to permanent camps with latrines).  In the United States, the matter has been of concern to

fighting forces.  General George Washington was reportedly "appalled" that latrines were dug in

proximity to kitchens. Edward Countryman, The American Revolution (2003), at 135. After the

Spanish-American War, Major Walter Reed, the U.S. Army physician, co-authored an

exhaustive report focused in large part on the relationship between latrine upkeep and the spread

of disease. See Walter Reed, Victor C. Vaughan & Edward O. Shakespeare, Report on the

Origin and Spread of Typhoid Fever in U.S. Military Camps During the Spanish War of 1898

(1904), at 329 (discussing latrine hygiene practices of the Twelfth Pennsylvania Infantry to guard

against typhoid, including requirement that soldiers wash hands with soap and water "under the

supervision of a sentinel posted at each latrine for this purpose"); Id. at 533 (citing location of

latrine as contributing to spread of typhoid); Id. at 607 (high typhoid morbidity rate for soldiers

staying in tents near latrines); Id. at 663 (discussing latrines as locus for spread of typhoid).

Thus, it has long been recognized that the creation and maintenance of these necessary facilities

is integral to sustaining combat operations.


### f.   Scope of Displacement

Having determined that Boyle extends to the combatant activity exception, and

that the claim here arose from combatant activity, one inquiry remains to be made. The Saleh

Court, citing Boyle, admonished that "the 'scope of displacement' of the preempted non-federal

substantive law must be carefully tailored so as to coincide with the bounds of the federal interest

being protected." Saleh, 580 F.3d at 8. That court fashioned the following test: "During

wartime, where a private service contractor is integrated into combatant activities over which the

military retains command authority, a tort claim arising out of the contractor's engagement in

such activities shall be preempted." Id. These requirements, that the contractor be integrated

and that the military retain command authority, appropriately tailor the scope of preemption to

26

serve the federal interests at stake:  eliminating tort from the battlefield, freeing military commanders from any doubt or uncertainty caused by the imposition of state tort law, and preventing costs from being passed through to the United States.  Where a contractor is not integrated into military operations and subject to military command, it will not be protected.

The plaintiff does not address whether Kellogg was integrated into operations and subject to the command authority of the military.  From a review of the evidence presented by Kellogg, however, I determine that the test has been met.  Kellogg operated under the LOGCAP Contract and pursuant to Task Order 139, under which Kellogg was required to provide operation and maintenance services at various designated Army base camps across Iraq.  At Camp Shield, Kellogg provided these services at the direction of and in coordination with military personnel, including the "Mayor," Major Hockett.  Major Hockett confirmed that the military had command authority over the base.  (Hockett Dep. at 14.)  In performing its duties, Kellogg took direction and coordinated with the "Mayor" and his "Cell," as well as the Administrative Contracting Officer ("ACO").  (Pauley Decl. ¶ 6.)  Any renovation activities required approval from the "Mayor's Cell" or ACO before they could be performed.  Furthermore, the "Mayor's Cell" ultimately controlled the order in which projects on the list would be prioritized and completed, depending on the military's budgetary and other considerations.  (Id. at 7.)  For minor repair work, the "Mayor's Cell" monitored to see that Kellogg was living up to the contract.  (Hockett Dep. at 59.)  This evidence is undisputed.  Therefore, there is no genuine dispute whether Kellogg's services were integrated into the activities over which the military retained command authority.

Because plaintiff's claim against Kellogg arises from combatant activity of the military, and Kellogg was integrated into activities over which the military retained command

27

authority, plaintiff's claim is preempted.  Therefore, this Court need not consider Kellogg's other defenses.

CONCLUSION

For the reasons above, defendant's  motion for summary judgment (Document No. 26) is GRANTED.  The Clerk is directed to enter judgment for the defendant.

SO ORDERED.

_____
P. Kevin Castel
United States District Judge

Dated: New York, New York
        March 31, 2011

28